**SO ORDERED.**

**SIGNED this 9 day of June, 2022.**

_____
**Joseph N. Callaway**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## GREENVILLE DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| BAIRD STOKES | 21-01615-5-JNC<br>CHAPTER 7 |
| DEBTOR | |

### ORDER DENYING MOTION FOR TURNOVER

Pending before the court is the debtor's Amended Motion for Turnover (Dkt. 48, the "Motion") filed pursuant to 11 U.S.C. § 542. Belhaven Shipyard and Marina, Inc., d/b/a River Forest Shipyard (the "Shipyard") and its owner William Axson Smith, Jr. filed a response (Dkt. 52). An evidentiary hearing on the Motion was noticed for and held on May 4, 2022 in Greenville, North Carolina. Attorney Edwin Hardy represented the moving party and debtor in this chapter 7 case, Mr. Baird Stokes. Attorney Cierra Rogers appeared for the Shipyard and Mr. Smith. Based on the evidence presented at the hearing and the existing record in the case, the court finds and determines as follows:

1. The Debtor owns a 1983 Freedom Sailboat, 39.9' in length and named the Resolute (the "Sailboat"), currently located in dry dock at the Shipyard business location in Belhaven, Beaufort County, North Carolina.

2. Mr. Stokes purchased the Sailboat in Maryland and moved it to Belhaven in 2019, docking at the Shipyard. He intended to make necessary repairs to the Sailboat and sail it to the Caribbean and Europe. At his request, the Shipyard hoisted the Sailboat out of the water and placed it in a dry dock to undertake repairs.

3. Mr. Stokes for a time lived on the dry-docked boat with water, sewer, and electric hook-ups provided by the Shipyard, and along with employees of the Shipyard worked on repairing the boat in anticipation of the trans-Atlantic voyage. The Sailboat has remained in dry dock storage at the Shipyard location since that time.

4. During this time, Mr. Stokes also performed various jobs around the Shipyard and on residential properties owned or controlled by Mr. Smith, including running errands, yard maintenance, painting, minor carpentry and plumbing repairs, and participating in towing jobs involving other vessels. Mr. Stokes testified that he viewed this arrangement as a barter or trade for rent of the dry-dock storage for the Sailboat. He actually paid only minor intermittent rent the approximate year he lived on the Sailboat at the Shipyard.

5. Mr. W. Axson Smith III is an employee of the Shipyard and the son of Mr. Smith. He manages day-to-day operations at the Shipyard and dealt with Mr. Stokes during the pertinent time. He testified the Shipyard regularly charges $300 per month for storage of vessels the size of the Sailboat plus utilities that would average approximately $40.00 a month. He denied that a barter arrangement as described by Mr. Stokes existed, but acknowledged that Mr. Stokes performed odd job work at the facility and for his father, and that Mr. Stokes participated in some boat-towing actions. He asserted that Mr. Stokes acted only as a deckhand (at $15.00 per hour) rather than boat captain (at $45.00 per hour). He maintained Mr. Stokes has been paid for all past services rendered for the Shipyard.

6. The parties maintained an amicable relationship until some point in the fall of 2020, when the friendly affiliation began to break down. The matter came to a head by March of 2021, when Mr. Stokes removed a separate vessel that he owned (a 27' 1984 Freedom Sailboat) from the Shipyard. The local constabulary were called by both parties at different times in the first part of 2021, and by the Petition Date Mr. Stokes was banned from entering the premises of the Shipyard and had moved out of the Sailboat. Unlike the smaller 1984 Freedom, the Sailboat remains on the premises of the Shipyard stored and parked in its dry dock.

7. Only one document was presented and admitted into evidence at the hearing, being a one-page summation of monthly bills invoice from the Shipyard dated February 26, 2021 that reflects accumulated charges before and after that date, and without logical bill number sequence, for alleged storage, utilities, repairs, legal fees, and advertising totaling $17,547.54. Of this amount, $10,002.54 is claimed and shown as incurred and owed prior to the filing of Mr. Stokes' chapter 7 petition through the filing of the Motion.

8. Mr. Stokes filed the accelerated chapter 7 petition (Dkt. 1) on July 20, 2021 (the "Petition Date"). The schedules and statements followed on September 1, 2021 (Dkt. 18). In Schedule A/B (page 4 of 52), a value of $10,000 is listed for the Sailboat. In his Schedule C (page 12 of 52), the Sailboat is claimed and asserted as his residence with the full $10,000 value of claimed as exempt pursuant to 11 U.S.C. § 522 and N.C. Gen. Stat. § 1C-1601(a)(1).

9. No objection to the $10,000 value of or the residential exemption in the Sailboat has been filed by any party. The time for filing an objection to exemption has passed as a matter of bankruptcy law, and the residential exemption in the Sailboat is therefore deemed allowed. Further, the listed $10,000 value for the Sailboat was stipulated by the parties at the hearing for purposes of the Motion.

10.     A prepetition judgment in the amount of $5,101.36 was obtained by Mr. Smith and entered against Mr. Stokes in case 20-CVM-374 by the small claims court of Beaufort County, North Carolina, pertaining to repair and storage fees associated with the 1984 Freedom Sailboat. That claim is listed by the Debtor as unsecured in his Schedule F, page 19 of 52 (Dkt. 18). The judgment does not relate to the Sailboat that is the subject of the Motion.

11.     At least four other legal actions were filed in Beaufort County between the parties in the first half of 2021, with various claims, crossclaims, and declarative relief asserted, none which reached judgment, some of which involved the Sailboat. These actions were frozen as of the Petition Date by the automatic stay in bankruptcy. In one of the cases, the state District Court of Beaufort County had issued an interlocutory order of lien for the Shipyard against the sailboat.

12.     On October 11, 2021, Mr. Stokes filed a motion (Dkt. 31) seeking to avoid any lien adhering to the Sailboat as a result of the prepetition Beaufort County judgment and other orders entered by the Beaufort County courts in the pending lawsuits. A hearing thereon was conducted at which Mr. Smith appeared on his own behalf. By order of December 2, 2021 (Dkt. 45), the court denied the motion to avoid lien, finding that no valid state law lien arose from the Beaufort County judgment or other orders from state court because the Sailboat was personal property rather than real property, and no evidence of a specific order for a state law lien on personal property existed from this 2020 case or the other various 2021 actions filed in Beaufort County.

13.     In its December 2, 2021 order, the court also found that: (a) the Sailboat is Mr. Stokes' residence for exemption purposes in his bankruptcy case; (b) no ruling on turnover or possession rights to the Sailboat was made or sought in the underlying motion; (c) the existence or validity of a potential maritime lien under federal law was not considered or determined; and (d) nothing in the order affected the rights of the Shipyard to assert and seek to collect storage fees accumulating after the petition date. The order further clarified that Mr. Stokes is entitled to access the Shipyard in order to physically board the Sailboat for the purpose of (i) inspection; (ii) minor repairs and maintenance; and (iii) removal of his personal property located therein.

14.     On December 8, 2021, Mr. Stokes made formal demand for the surrender of the Sailboat from the Shipyard and Mr. Smith, but they rejected the demand for return, asserting the existence of a maritime lien in admiralty against the vessel separate from any prior claim under the state court judgment. They refused to hoist the Sailboat back into the water while the repair and storage bill remains unpaid.

15.     In the Motion, Mr. Stokes seeks turnover of the Sailboat, maintaining (a) no lien exists for dry dock storage; (b) any repair work and supplies furnished by the Shipyard are offset by prepetition unpaid amounts remaining due under the alleged barter and trade for work arrangement; (c) in filing the case resulting in the Beaufort County judgment, the Shipyard and Mr. Smith elected to pursue state law remedies and thereby waived federal maritime lien rights; and (d) while in the Shipyard's possession in the drydock, the Sailboat has acquired two holes in the hull below the waterline, the costs of repair of which offsets its claims. The Shipyard defends on the basis it holds a valid and unpaid federal maritime line against the Sailboat.

## Jurisdiction

This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 151, 157 and 1334, and the general order of reference from the United States District Court for the Eastern District of North Carolina dated August 3, 1984. Because it seeks determination of rights regarding and concerning matters affecting the administration of estate property, and as admitted by the parties, it is a core proceeding in which final orders or judgments may be entered by a bankruptcy court pursuant to 28 U.S.C. § 157(b)(2)(A) and (E). It also affects rights regarding the amount, status and priority of claims requiring review and adjustment of the debtor-creditor relationship under the Bankruptcy Code. *Id.* § 157(b)(2)(O). Venue is proper pursuant to 28 U.S.C. § 1409.

## Maritime Lien Law

In this action, Mr. Stokes seeks turnover of the Sailboat, against which the Shipyard argues it holds a maritime lien. A maritime lien is a federal statutory lien founded in admiralty. *In re H&S Transp. Co.,* 42 B.R. 164, 168 (Bankr. M.D. Tenn. 1984). Admiralty is an enumerated power of the federal government exclusively reserved in the United States Constitution. U.S. Const. Art. III, § 2, cl. 1. Maritime liens are codified in Title 46 of the United States Code, which provides, in pertinent part,

> **(a)** Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—
> **(1)** has a maritime lien on the vessel;
> **(2)** may bring a civil action in rem to enforce the lien; and
> **(3)** is not required to allege or prove in the action that credit was given to the vessel.
>
> **(b)** This section does not apply to a public vessel.

46 U.S.C. § 31342 (the "Maritime Lien Act").

"The federal maritime lien is a unique security device, serving the dual purpose of keeping ships moving in commerce while not allowing them to escape their debts by sailing away. The lien is a special property right in the vessel, arising in favor of the creditor by operation of law as security for a debt or claim." *Equilease Corp. v. M/V Sampson,* 793 F.2d 598, 602 (5th Cir. 1986) (citations omitted). A maritime lien is grounded in "the legal fiction that the ship itself caused the loss and may be called into court to make good." *Ventura Packers, Inc. v. F/V Jeanine Kathleen,* 305 F.3d 913, 919 (9th Cir. 2002). "The perfection of a maritime lien does not require that a creditor record his lien, obtain possession of the vessel, or file a claim against the ship." *In re Muma Servs., Inc.*, 322 B.R. 541, 546 (Bankr. D. Del. 2005).

"For a party to establish a maritime lien in a vessel: (1) the good or service must qualify as a "necessary"; (2) the good or service must have been provided to the vessel; (3) on the order of the owner or agent; and (4) the *necessaries* must be supplied at a reasonable price." *Barcliff, LLC v. M/V Deep Blue, IMO No. 9215359*, 876 F.3d 1063, 1068 (11th Cir. 2017) (emphasis added).

The term ''necessaries'' is ''interpreted broadly to include any goods or services 'reasonably needed' in a ship's business for a vessel's continued operation." *In re Aloha Racing*, 257 B.R. 83, 89 (Bankr. N.D. Ala. 2000) (*citing Newport News Shipbuilding & Dry Dock Co. v. S.S. Independence*, 872 F. Supp. 262, 265 (E.D.Va.1994). *See also Robbie's of Key W. v. M/V Komedy III*, 470 F. Supp. 3d 1264, 1268–69 (S.D. Fla. 2020).

The term "vessel" is not defined by the Maritime Lien Act. However, it is defined in the General Provisions Title of the United States Code as "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3 (1997). "A craft does not have to be employed in commerce or even be employed in navigation to be a vessel." *In re Aloha Racing*, 257 B.R. at 89 (Bankr. N.D. Ala. 2000) (*citing M/V Marifax v. McCrory,* 391 F.2d 909 (5th Cir.1968). All that is required is an intent to use the vessel as a means of transportation after the repairs are effectuated.

**Analysis**

Mr. Stokes testified that he motored and sailed the Sailboat from Maryland to Belhaven, North Carolina, and that when repaired he intends to sail it to the Caribbean and then across the Atlantic Ocean into the Mediterranean Sea. He seeks to have the Shipyard compelled to hoist and place the Sailboat from dry dock back into the water so he can move it to another marina for further repairs necessary to undertake the planned voyage. The Sailboat is not a raft, small canoe, or dingy rowboat; it is an ocean-going craft capable of long distance, trans-oceanic voyages. Without question, it is a "vessel" as defined by federal law and contemplated in the Maritime Lien Act.

The evidence presented at the hearing, resulting in the findings listed above, shows that the Shipyard began working on the vessel in late-spring 2019 and the work continued August 2020. The work includes a haul out and blocking charge because hull work, as a practical matter, cannot be accomplished in the water. Mr. Stokes testified that hull work is required before the Sailboat can be taken on the long oceanic voyages he contemplated. Safely maintaining a vessel legitimately in the possession of a party in the repair and storage business (like the Shipyard) is a "necessary" part of that service. All of these services, including dry-dock storage without which work on the hull could not occur, constitute "necessaries" as contemplated in 46 U.S.C. § 31301(4).

Having determined that the Sailboat is a vessel, and that work performed by the Shipyard along with dry dock storage qualifies as sufficiently "necessary" to invoke a maritime lien pursuant to 46 U.S.C. § 31342, the question that follows is what claimed amounts are reasonable. This issue is further complicated by the falling out of the parties that halted repair work, sparked state court litigation, and triggered the intervening bankruptcy petition. Consequently, for proper analysis, the maritime lien claim must be divided into charges accruing before and after the petition date.

The Exhibit A invoice from the hearing summarizes the maritime lien charges asserted by the Shipyard totaling $17,547.54. For analysis purposes here, those charges are divided into the following categories:

| Time | Dates | Amount |
|---|---|---|
| Prepetition (May 2019) | Haul out, repairs, electric | $  791.62 |
| Prepetition (August 18, 2020) | Re-block | $  166.05 |
| Prepetition (May 2019 to August 2020) | Drydock Storage and utilities | $5,235.58 |
| Prepetition (Sept. 2020 to February 2021) | Drydock Storage (no utilities) | $1,800.00 |
| Prepetition (March 2021 to July 2021) | Drydock Storage (no utilities) | $1,500.00 |
| Postpetition (July 28, 2021) | Labor | $  495.00 |
| Postpetition (August to December 2021) | Drydock Storage (no utilities) | $1,500.00 |
| Postpetition (December 1, 2021) | Legal fees | $5,000.00 |
| Postpetition (December 1, 2021) | Advertisement | $  550.00 |

      A careful review of the itemized list of charges contained in Exhibit A reveals numerous inconsistencies. First, the invoice is dated February 26, 2021, but on its face contains several entries charged long after that date. Also, the identifying numbers of the monthly bills reflected in it change in random fashion, with some of the later invoice numbers identified by bill numbers lower than bills subsequently issued for later months. Further, beginning at the time the parties fell out in late 2020, and somewhat randomly in 2021, the referenced monthly bill numbers become immediately sequential in eight instances in 2020 and 2021, as if no bills were generated during those months to other customers of the Shipyard. It does not qualify as a contemporaneous business document. The individual bills were not placed into evidence and therefore cannot be used by the Shipyard to establish the validity of timing and accuracy. On cross examination, Mr. Smith was stymied in explaining these and other inconsistencies. Taken together, these points can only lead to the conclusion that the Exhibit A invoice was generated after the fact in anticipation of this litigation in the bankruptcy court. Given its manufactured nature and with its veracity effectively challenged at the hearing, the invoice and its contents must be viewed with a jaundiced eye.

      Two items are removed from the Invoice as a matter of law without visiting credibility. The $550.00 advertising charge was not incurred for a sale enforcing a maritime lien because no such lien had been sought.  If the sale is affiliated with a state court order, the hearing on a prior motion found no such lien existed.  Also, no evidence of advertising was produced. Even more tellingly, attorney fees of $5,000 for state court work were unilaterally added. No evidence of an actual amount of fees charged, the timing thereof, a contract with attorney fee recovery provisions, or relation to enforcement of a maritime lien were presented. At best, the fees appear to be incidental to the host of personal claims and crossclaims of the parties filed in state court. Finally, no motion under 11 U.S.C. § 506(b) has been filed by the Shipyard seeking to impose attorney fees incurred prior to the present hearing and controversy. Parties are not allowed to assess attorney fees in bankruptcy cases without a showing of statutory or contractual entitlement, reasonableness, and excess equity in the subject collateral. The claims for advertising and legal fees totaling $5,550.00 are denied.

      As for the other prepetition charges, the first two lines of the table above totaling $957.67 are for haul out, miscellaneous small repairs, and dry dock blocking.  These are precisely the type of repairs and services contemplated for maritime liens. Similarly, the July 28, 2021 labor charges secured the boat and providing for its haul-in return to navigable waters if ordered qualifies as well. This total $1,452.67 are allowed in favor of the Shipyard as part of its maritime lien.

Having found above that dry stock storage qualifies as a "necessary" for maritime lien purposes, the remaining question here is when did storage charges begin accruing on the lien. With respect to the prepetition storage charges, in addition to the inconsistencies noted above, Mr. Stokes testified at some length that he performed work at the facility and in towing jobs in exchange for free rent. The younger Mr. Smith admitted that Mr. Stokes preformed work at or for the Shipyard, including going on towing voyages (but only as a deckhand and never as a vessel master),[1] but he denied a barter arrangement existed. However, denying that an arrangement prior to the falling out begs the question of why the bills contained the inconsistencies and timing problems noted above. Further, the court finds Mr. Stokes' testimony modestly more credible on this point as it is buttressed by the invoice inconsistencies. The arrangement existed until the relationship of the parties sufficiently soured by the fall of 2020. Further, the dry dock storage continued to be necessary postpetiton for the same reasons, and the automatic stay of 11 U.S.C. § 362(a) does not prevent or stop the accumulation of valid postpetition storage charges. *City of Chicago v. Fulton*, 141 S. Ct. 585 (2021). The Shipyard has retained possession of and protected the Sailboat at all times since the petition date.

The testimony presented at the hearing establishes that the Shipyard regularly charges its customers dry-dock storage fees of about $300 per month for vessels the size and build of the Sailboat, and also this amount is not irrationally out of line with similar charges of other marinas, shipyards and boat storage businesses in the area. No additional utility charges are sought by the Shipyard for this period of time, unlike earlier when Mr. Stokes lived in the Sailboat on the drydock. Therefore, for the twenty-one months beginning September 2020 and through May 2022, the sum of $6,300.00 has accumulated. Storage charges contained in the Invoice for prior to that time are denied. Adding this amount to the $1,452.67 noted above yields a total maritime lien of $7,752.67 as of May 31, 2022. Accordingly, the court finds that the Shipyard holds a valid, and existing maritime lien against the Sailboat for $7,752.67, with $10.00 per diem storage accumulating each day after May 31, 2022. Therefore, the Motion for Turnover is **DENIED.**

The Shipyard may retain possession of the Sailboat until the lien is paid or another arrangement is reached. To require surrender of the vessel before lien satisfaction would likely ensure nonpayment as the vessel could soon sail beyond the jurisdiction of the United States. Retention of possession does not disturb the "status quo of estate property as of the time when the bankruptcy petition was filed." *City of Chicago v. Fulton*, 141 S. Ct. at 590. On the other hand, no relief has yet been requested by the Shipyard that would allow enforcement of the maritime lien through a sale or other mechanism. The vessel remains part of the bankruptcy estate and relief

---

[1] The difference between serving as a deckhand or a captain is $30 per hour ($15 versus $45). Mr. Stokes testified that he participated in more than twenty-five such trips, each lasting several hours. He estimated at least $3000.00 remained unpaid, and requested this amount be offset against any maritime lien rendered for the Shipyard. As stated, in addition to contesting the existence of the barter arrangement, the Smiths deny that Mr. Stokes was ever employed as a towing boat captain. Mr. Stokes, as the proponent of such claims, has the burden of proof to establish more money is owed to him by the Shipyard for vessel master work. He provided no documentary evidence, did not testify with accuracy as to specific dates, work, time or amounts in the towing jobs, and failed to produce into evidence a valid captain's license effective during these dates. And frankly, the Smiths' testimony was more credible on this point than that of Mr. Stokes. Because he failed to carry his burden on recovery for towing jobs at the captain's rate, no further offset against the maritime lien debt is warranted.

from the automatic stay is first required. Further, upon a tender of the $7,752.67 lien amount (plus intervening per diem storage) in good funds, the Shipyard and Mr. Smith MUST immediately return the Sailboat to the reasonable instruction of Mr. Stokes, including placing the Sailboat back into the navigable waters adjacent to the Shipyard (if so instructed) without additional charge. Failure to do so could in and of itself be a violation of the automatic stay. The Sailboat remains property of the estate for now, and the court retains full jurisdiction over it, the maritime lien established herein, and all related matters.

**IT IS SO ORDERED.**

**END OF DOCUMENT**